**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NANCY MARTINEZ, on behalf of herself and her minor children, M.A.M. and U.A.M., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT**

## INTRODUCTION

1. On June 9, 2025, masked federal agents abducted Nancy Martinez, a long-time New Haven resident and mother of two, while she was taking her children to school.

2. As the men handcuffed Ms. Martinez next to her car, she thought mostly of her two children, inside the vehicle, who had just buckled their seatbelts. She was struck by intense confusion and fear. She did not understand who these men were or what they were saying to her. She feared they would become violent if she resisted and did not know what would happen to her son and daughter if they took her away. Minutes later, she was in the back of an unfamiliar car, driving away as her children cried out for her from the sidewalk. No agent stayed behind to ensure the safety of the terrified children.

3. Nine-year-old U.A.M., once a bubbly child, now struggles to sleep through the night. At school, he frequently interrupts class with his crying. Once, he sat down outside a classroom, told his teacher that he missed his mom, and stayed on the ground crying for almost

1

twenty minutes. Another time, he went up to a police officer at school asking why the officer had taken away his mother and pleading to return her to him.

4.      Fourteen-year-old M.A.M. struggles to focus on her schoolwork. She has had to take on significant responsibilities at home to help raise her younger brother. Shouldering the weight of being a growing teenager and now a caregiver has taken its toll. Following her mother's abduction, M.A.M. became a shell of herself, uncharacteristically irritable, reticent, and withdrawn.

5.      U.A.M. and M.A.M. are U.S. citizens who have resided in Connecticut their whole lives. They have experienced significant emotional distress since their mother's abduction on June 9, 2025.

6.      Ms. Martinez, on behalf of herself and her minor children U.A.M. and M.A.M., now brings this civil action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), to seek redress for the abusive manner in which the agents abducted Ms. Martinez off the street, the terror and trauma they inflicted on her family, and the reckless disregard the agents demonstrated for her and her children.

## JURISDICTION AND VENUE

7.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b)(1) because this action seeks to redress injury caused by the negligent or wrongful act or omission of employees of the United States government.

8.      Venue lies in this district under 28 U.S.C. § 1402(b), because the events that give rise to this action occurred in Connecticut.

9.      On November 12, 2025, Plaintiffs satisfied the presentment requirement of the Federal Tort Claims Act ("FTCA") by serving written notices of their claims on the U.S.

Department of Homeland Security ("DHS") and Immigration and Customs Enforcement

("ICE"). It has been more than six months, and neither agency has responded to Plaintiffs'

written notice. Plaintiffs' FTCA claims are therefore ripe for adjudication.

10.     ICE agents are law enforcement officers for the purposes of 28 U.S.C. § 2680(h).

They are empowered by law to execute searches, to seize evidence, or to make arrests.

## PARTIES

11.     Plaintiff Nancy Martinez Zarco lived in The Hill neighborhood in New Haven,

Connecticut for fifteen years, until June 9, 2025. She currently resides in Mexico.

12.     Plaintiff M.A.M. is fourteen years old and was born in Connecticut, where she

now resides. She was thirteen on June 9, 2025, when she watched the United States government

take away her mother. She is a United States citizen.

13.     Plaintiff U.A.M. is nine years old and was born in Connecticut, where he now

resides. He was eight on June 9, 2025, when he watched the United States government take away

his mother. He is a United States citizen.

14.     Defendant United States of America is sued under the FTCA, 28 U.S.C.

§ 1346(b), for the tortious acts of its employees, including employees of DHS and ICE.

## STATEMENT OF FACTS

*ICE's Intensified and Militarized Approach*

15.     During his unsuccessful 2020 reelection campaign, President Donald Trump

called for "the largest domestic deportation operation in American history."

16.     During his 2024 reelection campaign, Mr. Trump complained that immigrants are

"poisoning the blood of our country."

3

17.     Since Mr. Trump took office in January 2025, ICE has engaged in months of high-profile, militarized immigration raids in major American cities.

18.     In May 2025, Stephen Miller, White House Deputy Chief of Staff and Homeland Security Advisor, announced that ICE would have a goal of arresting 3,000 or more immigrants a day. Arrests of Latinos subsequently surged 235%.

19.     Senior administration officials have pressured ICE agents to meet this quota by any means—even if in violation of ICE's own regulations, statutes, or the Constitution.

20.     ICE has increasingly targeted noncitizens at previously protected locations, such as schools and courthouses. ICE officers have claimed the right to enter people's homes without a judicial warrant.

21.     ICE officers often disguise their identities from the public: they don masks, drive unmarked cars, and refuse to identify themselves to individuals who ask. ICE officers undertake these practices notwithstanding regulations that require ICE officers to identify themselves when conducting arrests. *See* 8 C.F.R. § 287.8(c)(2)(iii)(A) (providing standards of conduct that immigration enforcement officers must follow).

22.     ICE agents employ these tactics purposefully, in large part to create an atmosphere of fear, where citizens and noncitizens alike worry that they will be the next person assaulted by federal agents or taken from their families by armed, masked men in unmarked cars.

23.     ICE intentionally uses these scare tactics for the purpose of frightening other immigrants, who are not the immediate targets of arrest actions, to pressure others to "self-deport" rather than risk similar arrests. As former Secretary of Homeland Security Kristi Noem threatened, "If you wait until we have to arrest you, you will never get to be an American, much less live here and work here and be able to pursue the American dream."

24.     ICE has also targeted specific jurisdictions that it views as pro-immigrant.

25.     On April 28, 2025, President Trump signed Executive Order 14287, directing the Department of Justice to designate certain "sanctuary jurisdictions." The Department of Justice published this list of jurisdictions, which included Connecticut. The Executive Order also threatened loss of funding, legal action, and more in sanctuary jurisdictions.

26.     In a June 2025 press conference, for instance, Todd Lyons, Acting Director of ICE, said, "If sanctuary cities would change their policies . . . we would not have to go out to the communities and do this."

27.     ICE has specifically targeted Connecticut, as early as June 2025.

28.     On June 6, 2025, ICE agents arrested a father and son in Hartford after they attended a scheduled immigration check-in. The 16-year-old senior was set to graduate from high school, with honors, in under a week.

29.     On June 9, 2025, approximately 15 minutes after Ms. Martinez's arrest, armed ICE agents detained four individuals at Southington's D-Hand Car Wash. The four men had been working at D-Hand for eight years and were described by their former employer as "very good people."

30.     Communities in Connecticut rallied in support of the individuals and families affected by ICE aggression in these June 2025 enforcement actions. Community members protested each abduction as part of a coordinated attack on civil liberties, labor rights, and the dignity of Connecticut's immigrant community.

31.     Two months later, ICE launched "Operation Broken Trust," a four-day operation specifically targeting Connecticut in explicit retaliation for Connecticut's Trust Act, which the General Assembly amended to impose additional limitations on cooperation between local law

enforcement and ICE. The legislature had passed the bill in May 2025 and the Governor signed it into law on the very date that ICE arrested Ms. Martinez. *See* Conn. Acts No. 25-29 (Reg. Sess.) (amending Conn. Gen. Stat. § 54-192h).

32.    Over the course of this operation ICE detained sixty-five individuals in Connecticut, including at least four men who were on their way to court. Videos taken outside of the Danbury Courthouse, for example, depict ICE agents removing an individual from his truck, throwing him to the ground, and violently tasing him.

33.    Two months after Ms. Martinez's arrest, ICE announced in its own press release that Connecticut was a "sanctuary no more" due to the federal agency's aggressive enforcement operations there.

34.    On April 14, 2026, the U.S. Department of Justice sued the State of Connecticut and New Haven over their sanctuary policies, including the Trust Act as amended in 2025 and New Haven's "Welcoming City" executive order. *See United States v. Connecticut, et al.*, No. 3:26-cv-568-AWT (D.Conn.).

35.    Even after Ms. Martinez's arrest, ICE has continued to publicly and aggressively detain people in Connecticut: in April 2026, ICE arrested a straight-A high-school senior. ICE has shown little mercy, not even for children.

36.    Around the country, ICE's militarized tactics have resulted in violent and sometimes fatal interactions with immigrants and citizens. ICE and other federal agents have wounded countless immigrants and citizens and caused enormous emotional distress.

37.    Thus far in 2026, ICE has killed two U.S. citizens, and at least nineteen other individuals have died in ICE custody.

38.    Children have not been immune from these impacts. ICE has arrested and detained some children and traumatized many others who have witnessed the aggressive and sometimes violent seizure of their parents, relatives, neighbors, and friends.

39.    While ICE's own policies require officers to enforce laws humanely by ensuring children of detainees are protected and cared for, ICE officers have failed to abide by these standards.

***In the United States, Citizens and Noncitizens Alike have Constitutional Rights***

40.    The United States Constitution stands between ICE officers' campaign of violence and fear and the potential victims they conspire to abduct.

41.    Noncitizens have Fourth Amendment rights against unreasonable searches or seizures. ICE officers cannot arrest them without a warrant or probable cause.

42.    Noncitizens have Fifth Amendment rights, which entitle them to due process and equal protection of law.

43.    The officers' behavior towards Ms. Martinez violated her constitutional rights.

***Ms. Martinez had Deep Community Ties and Commitments in New Haven***

44.    Ms. Martinez was born in Mexico City.

45.    In 2010, she entered the United States and was removed shortly after, pursuant to an expedited removal order. Later that year, Ms. Martinez reentered the United States.

46.    Ms. Martinez lived in the United States for approximately fifteen years.

47.    She lived with her family in a first-floor apartment on Frank Street in The Hill neighborhood of New Haven.

48.    She had deep ties to her community and is a loving and supportive parent to her two children. Their teachers report that she never missed a parent-teacher conference.

7

49. In March 2025, Ms. Martinez was involved in a minor altercation with her sister-in-law over a babysitting dispute. The two women pushed each other. They were near a chain link fence in Ms. Martinez's backyard, and they both ended up with scratches.

50. When the police arrived, they arrested Ms. Martinez. She was charged with Assault in the 3rd degree and Breach of Peace in the 2nd degree. Ms. Martinez appeared for all court dates, and the State agreed that it would drop the charges if she attended anger management classes. Ms. Martinez did not plead guilty, and the court made no finding of guilt.

51. Ms. Martinez started her anger management program on May 12, 2025.

***Officers Surrounded Ms. Martinez and her Children on the Way to School***

52. On the morning of Monday, June 9, 2025, federal agents in an unmarked SUV parked on Frank Street outside of Ms. Martinez's home.

53. Federal agents in another unmarked car parked on Frank Street, down the block from Ms. Martinez's home.

54. The agents in the cars watched the family home, waiting for Ms. Martinez and her children to emerge.

55. Around 8:45 am, Ms. Martinez, M.A.M., and U.A.M. stepped outside of their home.

56. M.A.M. carried her backpack, and U.A.M. held his lunchbox.

57. They walked to their family's small white sedan parked on the side of Frank Street. Ms. Martinez planned to drive the children to school before going for an appearance in her case at the New Haven Superior Court. It was the children's last week of classes before summer break.

58. The family entered the car.

8

59.    After the children shut the car doors, one unmarked vehicle, waiting ahead on the street, sped backward towards the family.

60.    An SUV behind them suddenly drove forward.

61.    A third car, a dark grey pickup truck, pulled alongside them.

62.    The unmarked cars boxed the family in. Suddenly, Ms. Martinez, M.A.M., and U.A.M. were surrounded by masked men, some of them visibly armed. They feared what the men would do next.

63.    Three masked men exited their vehicles and approached the driver-side door of Ms. Martinez's car.

64.    Without identifying themselves by name or asking consent, one man pulled open the driver's door, told Ms. Martinez they were "with the police," and asked Ms. Martinez for her name. The officers did not specify that they were immigration authorities. This behavior violated federal regulations requiring immigration officers to identify themselves as such. *See* 8 C.F.R. § 287.8(c)(2)(iii)(A).

65.    The officers got Ms. Martinez to step out of the vehicle and said they had a warrant for her arrest.

66.    With the car running and her children inside, ICE officers turned Ms. Martinez towards the car and began to handcuff her. The officers locked the handcuffs so tightly behind her back that, hours later, Ms. Martinez still had marks on her wrists.

67.    Her children, helpless, witnessed their mother's abduction.

68.    Another dark gray SUV pulled up behind the other cars on the street. One more officer emerged from the SUV and joined the others in restraining Nancy.

69.     ICE officers spoke solely in English to Ms. Martinez, who is a native Spanish speaker with limited English proficiency. They did not verify whether she understood what they were saying. They asked her questions that she did not understand and could not respond to. They used an airplane gesture to threaten her with deportation. They did all of this in violation of ICE's regulations requiring its officers to explain to the person being arrested why they are being arrested. *See* 8 C.F.R. § 287.8(c)(2)(iii)(B).

70.     Ms. Martinez tried to tell the men that she had a court appearance that morning. She repeatedly tried to communicate that she was with her children and did not know what would happen to them if she was taken away. The officers ignored her pleas.

71.     ICE officers violated ICE Directive 11064.3(5.2)(1) by not accommodating the children or making an effort to find them alternative care. In further violation, ICE personnel also did not facilitate nor document Ms. Martinez's decision to transfer physical custody of minor children to any identified third party.

72.     M.A.M. exited the family vehicle and walked toward her handcuffed mother. She mustered the courage to try to ask the masked officers why her mother was being arrested.

73.     One of the masked men blocked M.A.M.'s path, standing over the thirteen-year-old girl and between her and her mother. The officer looked down at M.A.M. and told her that there was a warrant for Ms. Martinez's arrest. The officers provided no further details.

74.     During or after the arrest, no one showed a warrant to M.A.M., U.A.M., Ms. Martinez, or her immigration attorney.

75.     As officers began to move a handcuffed Ms. Martinez away from her children and towards one of their vehicles, Ms. Martinez yelled for her mother, Maria Guadalupe Zarco Perez

("Ms. Perez"), to come out of the family's home. Ms. Perez was visiting her daughter and grandchildren from Mexico.

76.    Officers ignored Ms. Martinez's cries and forced Ms. Martinez into one of the unmarked cars.

77.    Ms. Perez, who speaks and understands only Spanish, approached the scene. She tried to obtain information from her grandchildren about what was going on. The officers ignored her.

78.    M.A.M. phoned her father, Ms. Martinez's husband, and handed the phone to an officer. M.A.M. and U.A.M.'s father is a native Spanish speaker with limited English proficiency. Communicating largely in Spanish, the officer stated that ICE had an arrest warrant for Ms. Martinez and that she would be taken to Hartford where she would have to see a judge for her immigration violations.

79.    The officer refused to tell the children's father where the arrest was taking place and ignored his questions about the children. The officer did not mention Ms. Perez's presence. Nor did the officer ask the children's father whether Ms. Perez had a relationship to the children.

80.    At no point did any officer attempt to communicate with either Ms. Martinez or Ms. Perez in Spanish.

81.    Just after placing Ms. Martinez in their SUV, officers suggested that M.A.M. turn off the engine and lock the family car. M.A.M. is too young to be eligible for a Connecticut driver's license and is not qualified to operate a car.

82.    Without saying more, the officers then returned to their vehicles and drove off.

83.    The officers provided no information to the family about how to contact Ms. Martinez.

11

84. The officers did not speak to or confirm the identity of Ms. Perez, nor her relationship (if any) to M.A.M. and U.A.M., before they drove off and left the two young children standing in the street with their car idling in the road.

85. The officers did not confirm whether the children had a caretaker, as required by law, after taking their mother away.

86. The officers did not inform the children's father as to his children's whereabouts.

87. Eight-year-old U.A.M. was left on the sidewalk crying.

88. A neighbor had to assist M.A.M., U.A.M., and Ms. Perez in turning off and securing Ms. Martinez's car.

89. Later that morning, the officers brought Ms. Martinez to a building in New Haven and then to a federal building in Hartford, Connecticut. There, they told her she was subject to an order of removal that had been entered in 2010.

90. The officers told her further that they were reinstating the removal order and would execute it shortly by deporting her to Mexico, where she was born.

91. Ms. Martinez did not see an immigration judge on June 9 or thereafter.

***New Haven Community Rallies around Ms. Martinez and her Family***

92. Two days after Ms. Martinez's arrest, hundreds of New Haven community members protested her detention outside of the federal office building in downtown New Haven.

93. The protest was jointly organized by fourteen community groups, including Unidad Latina en Acción ("ULA") and others.

94. M.A.M. spoke to the crowd about the devastation she felt from losing her mom.

95. On the same day, New Haven Mayor Justin Elicker released a statement condemning ICE's arrest of Ms. Martinez, saying it was unconscionable for ICE agents to arrest

12

her while she was taking her kids to school. Mayor Elicker vowed to continue standing up for New Haven residents and to fight back against the federal government's reckless immigration policies.

96.    Ms. Martinez's neighbors also organized a block party and fundraiser to support her family and help them pay for legal costs related to her immigration case.

*ICE Detains and Deports Ms. Martinez*

97.    Shortly after her arrest, ICE brought Ms. Martinez to Donald W. Wyatt Detention Facility in Rhode Island, where she remained for about a month. Ms. Martinez was also transferred to a detention facility in Maine and Strafford County, New Hampshire before she was shackled and put on a flight to Brownsville, Texas.

98.    While she was detained, Ms. Martinez's husband submitted a petition for a U (victim) visa and named Ms. Martinez as a derivative beneficiary.

99.    On July 7, 2025, Ms. Martinez applied for a stay of removal from ICE, based in part on her status as a derivative beneficiary of her husband's pending U visa petition.

100.    ICE declined to grant a stay of removal.

101.    By constructively denying Ms. Martinez's stay application and removing her to Mexico when she had a pending petition for a derivative U visa, ICE violated ICE Directive 11005.3. That Directive was rescinded on January 30, 2025, by ICE Directive 11005.4 and then judicially restored in *Immigration Center for Women and Children v. Noem*, 2026 WL 1455004 *45-47 (C.D. Cal. May 20, 2026) (certifying a class of people who were removed despite pending U-visa petitions and requests for stays of removal, staying enforcement of ICE Directive 1105.4, and enjoining DHS from preventing re-entry of class representatives who had been removed). By extending Ms. Martinez's separation from her children, ICE deepens this violation.

102.    A positive bona fide determination on her husband's U-visa petition would result in protection from removal for both Nancy and her husband. ICE Directive 1105.3.

103.    Approximately one month after her abduction, authorities drove Ms. Martinez from Brownsville, Texas to the port of entry in Matamoros, Mexico where they deported her. Ms. Martinez has lived in Mexico since.

104.    After ICE deported Ms. Martinez, state prosecutors entered a *nolle prosequi* in her case in New Haven.

***The Officers' Behavior on June 9, 2025 Traumatized M.A.M. and U.A.M.***

105.    M.A.M. and U.A.M. are very close with and dependent on their mother.

106.    U.A.M., who has significant and readily apparent speech, language, and developmental disabilities that make it difficult for him to communicate and care for himself in an age-appropriate way, is especially dependent on his mother.

107.    When U.A.M. was in kindergarten, Ms. Martinez advocated for him to receive proper testing and a formal diagnosis for his disabilities from a mental health professional.

108.    Ms. Martinez voluntarily brought U.A.M. to summer school, even when it was not required, and packed him lunch with his favorite foods, even though free lunch is available at U.A.M.'s school.

109.    Ms. Martinez engaged with her children's teachers, special education professionals, and school staff and attended their school events. She consistently advocated for both of her children at school.

110.    As a result of witnessing their mother's abduction, both children have demonstrated serious manifestations of emotional distress.

14

111. U.A.M. has frequently lashed out at security officers and other uniformed personnel at his school, whom he associates with the incident.

112. One day, U.A.M. yelled at a police officer on school grounds. He approached the officer at the school and asked why the officer took his mom away.

113. U.A.M.'s school psychiatrist reports that U.A.M. has regressed in his functioning since Ms. Martinez was detained.

114. U.A.M.'s teacher reported a loss of interest in his favorite activities and depressed and confused behaviors. In the months following his mother's arrest, teachers reported that U.A.M. has often interrupted class crying and shouting that he misses his mom.  His teacher frequently called Ms. Martinez from school because U.A.M. misses her and needs to hear her voice to get back on track.

115. Family members and school employees describe U.A.M. as increasingly dependent on his sister M.A.M. since the arrest. In one instance, U.A.M. saw M.A.M. in the hall, hugged her, and wouldn't let go, saying, "Don't go, don't leave me," or words to that effect.

116. U.A.M. often can no longer sleep in his own bedroom out of fear that someone will also take his sister away. When he does sleep, he is frequently awakened by nightmares.

117. M.A.M. has had to take on the responsibilities of an adult, despite being a young teenager: M.A.M. helps to care for U.A.M. physically, mentally, and emotionally.

118. M.A.M. also helps support her family financially, dedicating part of her summer to selling flan and chocolate-covered strawberries.

119. M.A.M. herself has experienced increased anxiety, distractedness, and inability to attend to her schoolwork. She frequently calls Ms. Martinez, expressing to her mother that she feels alone.

120.    M.A.M. has become uncharacteristically irritable, acting out on occasion.

121.    M.A.M. has seen the school psychologist, the school social worker, and the school counselor since her mother's abduction due to her symptoms. M.A.M. now sees an outpatient therapist for mental health counseling.

***The Officers' Behavior Inflicted Emotional Distress on Ms. Martinez***

122.    Ms. Martinez experienced feelings of depression, anxiety, disorientation, and fear during and after her sudden arrest, resulting in physical symptoms.

123.    Ms. Martinez requires psychiatric care to treat the ongoing symptoms of distress related to her sudden arrest in front of her children.

124.    When ICE agents arrested Ms. Martinez, she expressed terror over what would happen to her children without her daily presence. Being taken from them so suddenly caused her severe stress.

125.    Once inside the unmarked ICE vehicle, an officer told Ms. Martinez that they planned to deport her to Mexico. Ms. Martinez felt her heart drop in her chest. She started trembling, sweating, and struggling to breathe.

126.    In the back of the SUV, Ms. Martinez experienced her first ever anxiety attack. She has had frequent anxiety attacks since her arrest, including two that she was treated for while in ICE detention.

127.    For several months after her deportation, Ms. Martinez rarely left her room. She spent days crying in bed and could not sleep through the night. Her hair started to fall out, and she experienced anxiety-induced heart palpitations.

128.    Ms. Martinez suffers from stress-induced migraines. While in ICE detention, Ms. Martinez was medicated twice daily with Tylenol and ibuprofen for intense headaches.

129.    Since her arrest, Ms. Martinez has experienced abnormally frequent and heavy periods that, for the first time in her life, required her to purchase sanitary diapers.

130.    The intensity of her emotional and physical symptoms led Ms. Martinez to seek medical care. She now takes antidepressants and sleep medication to help her relax and rest.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

## FTCA, 28 U.S.C. §§ 2671–2680

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (All Plaintiffs)

131.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

132.    Under Connecticut law, intentional infliction of emotional distress exists where (1) the defendant intended to inflict emotional distress, or the defendant knew or should have known that emotional distress was likely a result of the conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the emotional distress was severe. *Appleton v. Stonington Bd. of Ed.*, 757 A.2d 1059, 1062 (Conn. 2000).

133.    ICE officials intentionally caused severe emotional distress to Nancy Martinez, M.A.M., and U.A.M. by abducting Ms. Martinez in front of her home while her children watched.

134.    The ICE officials' conduct was extreme and outrageous. Masked men in unmarked cars staking out a home to arrest a mother while she is taking her children to school and forcing her to leave them behind without knowing what would happen to them, "exceed[s]

17

all bounds usually tolerated by decent society." *Ancona v. Manafort Bros.*, 746 A.2d 184, 192 (Conn. 2000).

135.    ICE routinely issues notices to surrender for deportation and monitors noncitizens through regular check-ins. *See* 8 C.F.R. § 241.22 (notice to surrender for deportation); Aaron Reichlin-Melnick, New Report Details ICE's Expanding and Increasingly Unaccountable Detention System, Aᴍ. Iᴍᴍɪɢʀ. Cᴏᴜɴᴄɪʟ (Jan. 23, 2026) (discussing ICE's policy of arresting individuals at check-ins).

136.    Instead of using other available options for immigration enforcement, ICE officers chose to wear masks, drive unmarked cars, and conduct a public arrest for the purpose of causing emotional distress to Ms. Martinez, M.A.M., U.A.M., and the New Haven immigrant community.

137.    ICE intentionally used these tactics for the improper purposes of frightening other immigrant residents into "self-deporting" and retaliating against Connecticut and New Haven, so-called sanctuary jurisdictions.

138.    Ms. Martinez experienced emotional distress when ICE officers took her from her children, one of whom was crying out for her.

139.    Ms. Martinez also feared that the ICE officers would cause physical harm to her, due to the intimidating way they approached her and what she knew about ICE's violent operations.

140.    Any reasonable person would have known that surrounding a family on their way to school and having four masked agents take a mother away from her children would cause emotional distress to the mother and children.

141.    During the arrest, the officers could easily see the emotional distress they caused the children. M.A.M. begged the officers to explain what was going on, and U.A.M. cried out from the sidewalk. They continued the operation anyway.

142.    The officers' conduct directly caused emotional distress to U.A.M. and M.A.M.

143.    The children's emotional distress is severe. Symptoms include ongoing depressed and confused behavior, crying in class, inability to focus on schoolwork, and trouble sleeping.

144.    Ms. Martinez's emotional distress is severe and includes depression, anxiety, frequent crying, inability to sleep, stress-induced headaches, hair loss, abnormal periods, and more.

145.    The officers' conduct constitutes intentional infliction of emotional distress under Connecticut law.

146.    The officers were acting within the scope of their employment, as law enforcement officers seeking to arrest an individual, when they intentionally inflicted emotional distress on Nancy Martinez, M.A.M., and U.A.M.

147.    Under the FTCA, the United States is liable to Plaintiffs for its employees' intentional infliction of emotional distress.

## SECOND CLAIM FOR RELIEF

## FTCA, 28 U.S.C. §§ 2671–2680

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

## (All Plaintiffs)

148.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

149. Under Connecticut law, a defendant has engaged in the tort of negligent infliction of emotional distress when: (1) their conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

150. ICE officials created an unreasonable risk of emotional distress to Ms. Martinez and her children when they arrested her via forceful, extreme, and unnecessary methods in front of M.A.M. and U.A.M.

151. It was foreseeable that Ms. Martinez and her children would experience severe emotional distress as a result of her abduction, and that such emotional distress might result in illness or bodily harm.

152. ICE officials should have realized that kidnapping Ms. Martinez in front of her children involved an "unreasonable risk of causing emotional distress" to Ms. Martinez, M.A.M., and U.A.M.

153. From the facts known to them, including the children's immediate reaction to their conduct and Ms. Martinez's repeated statements that she did not know what would happen to her children if she was taken away, ICE officials should have realized that the distress they caused might result in illness or bodily harm to Ms. Martinez, M.A.M., and U.A.M.

154. U.A.M. and M.A.M. have difficulty sleeping, frequent nightmares, anxiety, and depression, which are symptoms of emotional distress that are severe enough to result in illness or bodily harm.

155. Ms. Martinez experienced feelings of confusion, fear, anxiety, and depression during and after her sudden arrest.

156. Officers' forceful conduct left M.A.M. frightened and intimidated. U.A.M.'s school psychiatrist reports that U.A.M. has regressed in his functioning since Ms. Martinez was detained.

157. The officers' conduct constitutes negligent infliction of emotional distress under Connecticut law.

158. The officers were acting within the scope of their employment, as federal agents seeking to arrest an individual, when they negligently inflicted emotional distress on Ms. Martinez, M.A.M., and U.A.M.

159. Under the FTCA, the United States is liable to Plaintiffs for damages for negligent infliction of emotional distress.

### THIRD CLAIM FOR RELIEF

### FTCA, 28 U.S.C. §§ 2671–2680

### FALSE IMPRISONMENT AND FALSE ARREST

### (Plaintiff Nancy Martinez)

160. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

161. Under Connecticut law, false imprisonment occurs when: (1) the defendant restrains the plaintiff's physical liberty; and (2) the plaintiff "did not consent to the restraint or acquiesce in it willingly." *Nodoushani v. S. Connecticut State Univ.*, 95 A.3d 1248, 1255 (Conn. App. Ct. 2014). "Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." *Green v. Donroe*, 440 A.2d 973, 974 (Conn. 1982).

162. Under Connecticut law, a false arrest occurs when: (1) the defendant intentionally arrested the plaintiff or had her arrested; (2) the plaintiff was aware of the arrest; (3) there was no

21

consent to the arrest; and (4) the arrest was not supported by probable cause. *Alberty v. Hunter*, 144 F.4th 408, 415 (2d Cir. 2025).

163. By statute, an ICE officer may make a warrantless arrest "if he has reason to believe" that the person arrested "is in the United States in violation of any [immigration] law or regulation *and* is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added).

164. ICE officers restrained Ms. Martinez against her will on the morning of June 9, 2025, as they intentionally arrested her.

165. ICE officers restricted Ms. Martinez's liberty by using unmarked vehicles to physically block her from driving her children to school.

166. ICE officers then surrounded Ms. Martinez's car themselves and handcuffed her, further restricting her liberty, and put her in their car.

167. ICE restrained Ms. Martinez against her will. She did not consent or willingly acquiesce to ICE's restraint.

168. Ms. Martinez was aware that the officers arrested her. They handcuffed her and took her in their vehicle. She asked them where they were taking her and what would happen to her kids.

169. Ms. Martinez did not consent to the arrest. She pleaded with the officers about her children.

170. The ICE officers did not present Ms. Martinez with a warrant. Even after her arrest, they never provided a judicial warrant. Nor did they provide an administrative arrest warrant, even in response to a Freedom of Information Act request from Ms. Martinez.

171.    The Second Circuit, in a brief 1982 *per curiam* opinion, held that "clear and undisputed" evidence of deportability "alone ***may*** provide a sufficient basis for an [immigration] officer to believe that escape is likely before a warrant can be obtained." *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982) (emphasis added).

172.    But Supreme Court precedent reaffirms that without a warrant, immigration officers may enact arrests "only where the alien 'is likely to escape before a warrant can be obtained.'" *Arizona v. United States*, 567 U.S. 387, 408 (2012); *see also Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980) (equating the statutory language discussed in *Arizona* to the probable cause requirement); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (same).

173.    "In evaluating whether probable cause exists, the court must look at the totality of the circumstances." *Friend v. Gasparino*, 743 F. Supp. 3d 415, 428 (D. Conn. 2024) (internal quotation omitted).

174.    The behavior ICE agents observed from Ms. Martinez indicated that she had strong ties to her community, including a home and children to care for.

175.    The officers also lacked probable cause because they knew that Ms. Martinez had a history of cooperating with law enforcement. On information and belief, the officers knew that Ms. Martinez would be leaving her home that morning because they knew she had a hearing at the courthouse.

176.    Based on the totality of the circumstances, the officers did not have probable cause to believe that Ms. Martinez was likely to escape before a warrant could be obtained.

177.    The officers were acting within the scope of their employment as law enforcement officers when they wrongfully arrested falsely imprisoned Ms. Martinez.

178.    Under the FTCA, the United States is liable to Ms. Martinez for damages for her false imprisonment and false arrest.

## FOURTH CLAIM FOR RELIEF

## FTCA, 28 U.S.C. §§ 2671–2680

## ASSAULT

## (Plaintiff Nancy Martinez)

179.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

180.    Under Connecticut law, an assault occurs when (1) the defendant intended to cause a harmful or offensive contact, or an imminent apprehension of such contact, with another person, and (2) the other person was put in imminent apprehension as a result. *Simms v. Chaisson*, 890 A.2d 548, 555-56 (Conn. 2006).

181.    Four masked officers approached and opened the door of Ms. Martinez's parked car. On information and belief, the officers intended to cause imminent apprehension of further harmful or offensive contact. Four unmarked vehicles menacingly surrounded Ms. Martinez and her children. Despite knowing that any reasonable person would fear physical harm, the officers opened Ms. Martinez's door without first identifying themselves.

182.    The officers committed assault when they intentionally put Ms. Martinez in imminent apprehension of harmful or offensive physical contact.

183.    Further, an officer turned Ms. Martinez around and tightly handcuffed her in front of her two crying children. A fourth officer approached. By physically turning and handcuffing Ms. Martinez, the officers intentionally caused harmful or offensive contact.

24

184.    The officers were acting within the scope of their employment as law enforcement officers when they committed the tort of assault against Ms. Martinez.

185.    Under the FTCA, the United States is liable to Ms. Martinez for damages for assault.

**FIFTH CLAIM FOR RELIEF**

**FTCA, 28 U.S.C. §§ 2671–2680**

**ABUSE OF PROCESS**

**(Plaintiff Nancy Martinez)**

186.    Plaintiff repeats and incorporates each allegation contained in the preceding paragraphs of this complaint as if fully set forth herein.

187.    Under Connecticut law, a defendant is liable for abuse of process when the defendant uses a legal process against another individual "primarily to accomplish a purpose for which it is not designed." *Mozzochi v. Beck*, 204 A.2d 171, 173 (Conn. 1987) (internal quotation marks omitted) (emphasis removed).

188.    ICE officers abused legal process by carrying out Ms. Martinez's arrest in a manner designed to intimidate her, her family, and the broader New Haven immigrant community, and to retaliate against what ICE considers to be a "sanctuary jurisdiction."

189.    Ms. Martinez's arrest is just one of multiple immigration enforcement episodes carried out in close succession. The others include the detentions of a Meriden student days prior to his high school graduation, his father, and, separately, four Southington car wash employees. Community members experienced these incidents as a coordinated attack on immigrant dignity.

190.    ICE arrested Ms. Martinez on the same day that Gov. Lamont signed into law legislation amending Connecticut's Trust Act to further limit state and local police cooperation with ICE, despite ICE's public and well-known opposition to such policies.

191.    The purpose of an immigration arrest is to prevent flight and protect the community from criminal acts or dangers. *See El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 278 (D. Conn. 2008).

192.    The officers had no reason to think that Ms. Martinez was likely to flee, nor that she posed any threat to her community. She was with her children on the way to school.

193.    There is no evidence to support the assertion that enforcing immigration laws required ICE officers to ambush Ms. Martinez outside of her home, surround her with masked officers, and leave her children behind on the street.

194.    ICE routinely issues notices to surrender for deportation and monitors noncitizens through regular check-ins.

195.    There was no obstacle to the officers sending Ms. Martinez a notice to surrender or to appear at ICE offices in Hartford for a check-in, as many Connecticut residents do each week. It is undisputed that ICE officers knew her home address.

196.    The ICE agents chose to arrest her in a sudden and public manner, with an overwhelming display of force, leaving her children weeping in the street for the improper purpose of intimidating and terrorizing her, her family, and the New Haven immigrant community and retaliating against a so-called sanctuary jurisdiction.

197.    Intimidating or terrorizing others is not a legitimate immigration purpose. *See El Badrawi*, 579 F. Supp. 2d at 278; *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) (holding that deterrence of other immigrants is an unlawful consideration in individual parole

determinations). The officers' unnecessarily terrifying behavior towards Ms. Martinez, including surrounding her, blocking traffic on the street with multiple vehicles, refusing to identify themselves, wearing masks, handcuffing her so tightly that she had marks, and forcing her into their car without attending to her children, reflects their intent to intimidate her and others.

198. The officers' dismissive behavior towards M.A.M. and U.A.M., who stood crying during the arrest, reflects their intent to intimidate the children as well.

199. On information and belief, the ICE officers' violent arrest of Ms. Martinez was part of an effort to intimidate the New Haven immigrant community and punish New Haven and Connecticut for being sanctuary jurisdictions. It was also an effort to deter other immigrants from asserting their legal rights or pursuing claims for status, and instead to "self-deport" lest they be next.

200. By using a legal process—arrest and deportation—to intimidate Ms. Martinez, M.A.M., U.A.M., and an entire community, the officers abused a legal process. *See El Badrawi,* 579 F. Supp. 2d at 278 ("This is the very definition of the tort of abuse of process: immigration officials were using the legal process of immigration detention for reasons other than the reasons for which the detention was designed.").

201. The ICE officers' actions constitute an abuse of process under Connecticut common law.

202. The ICE officers were acting within the scope of their employment when they abused legal process.

203. Under the FTCA, the United States is liable to Ms. Martinez for damages for abuse of process.

**SIXTH CLAIM FOR RELIEF**

27

**FTCA, 28 U.S.C. §§ 2671–2680**

**RECKLESSNESS**

**(All Plaintiffs)**

204.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

205.    Under Connecticut law, a defendant is liable for recklessness when the defendant consciously engages in conduct with (1) "knowledge of the serious danger to others involved in it" or (2) "knowledge of facts which would disclose this danger to any reasonable man." *Bishop v. Kelly*, 539 A.2d 108, 111 (Conn. 2006).

206.    ICE officers in an unmarked vehicle engaged in reckless conduct when they drove backward on a one-way residential street towards a family.

207.    ICE officers further engaged in reckless conduct when they forced Ms. Martinez into an unmarked vehicle and left her school-aged children behind on the street without identifying an adult who could assume a duty of care over the minors.

208.    The ICE officers did not confirm the identity of Ms. Perez or Ms. Martinez's husband, whom M.A.M. called on the phone.

209.    The ICE officers did not determine whether Ms. Perez or Ms. Martinez's husband was a trusted adult capable of caring for the children.

210.    The officers ignored Ms. Perez's presence at the scene. The Spanish-speaking ICE officer also ignored Ms. Martinez's husband when he asked about the children's whereabouts on the phone.

211.    The ICE officer also failed to confirm whether the children could re-enter their home or whether there was a trusted adult they could contact.

28

212.    M.A.M. and U.A.M. were minors, as evidenced by their appearance and school attire. A reasonable actor in the ICE officers' position would have recognized the serious danger of leaving two emotionally distressed children unattended on the street.

213.    Without exhibiting concern for the well-being of either child, one of the ICE officers paused momentarily only to tell M.A.M. to lock Ms. Martinez's car. The officers consciously omitted this level of care for M.A.M. and U.A.M. themselves.

214.    The officers were acting within the scope of their employment when they engaged in reckless conduct towards Ms. Martinez, M.A.M., and U.A.M.

215.    Under the FTCA, the United States is liable to Ms. Martinez for damages for recklessness.

## SEVENTH CLAIM FOR RELIEF

## FTCA, 28 U.S.C. §§ 2671–2680

## NEGLIGENCE

## (All Plaintiffs)

216.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

217.    Under Connecticut law, a defendant is negligent when: (1) a defendant owes a duty of care, (2) that duty is breached, (3) the breach of that duty causes injury, and (4) the plaintiff suffered actual injury. *Sic v. Nunan*, 54 A.3d 553, 559 (Conn. 2012).

218.    ICE officers acted negligently in their interactions with Ms. Martinez, M.A.M., and U.A.M., creating significant foreseeable harms when they used four cars to block the roadway, surrounding Ms. Martinez and her children before pulling her out of her car.

29

219.    In enforcement actions involving parents who are the primary caregivers of minor children, ICE officers owe a duty of care to "remain cognizant of the impact enforcement actions may have on a minor child." ICE Directive 11064.4: Detention and Removal of Alien Parents and Legal Guardians of Minor Children (2025). This cognizance may include accommodating a parent's efforts to make alternative care arrangements for their minor children prior to detention. *Id.*

220.    Connecticut law also creates a clear duty not to abandon children: "A child may be found 'neglected' who, for reasons other than being impoverished . . . has been abandoned." Conn. Gen. Stat. Ann. § 46b-120(4).

221.    The duty not to abandon children is not limited to parents or legal guardians.

222.    ICE officials breached their duty of care to M.A.M. and U.A.M. when, after forcing Ms. Martinez into an unmarked vehicle, the ICE officials drove off, leaving M.A.M. and U.A.M. standing in the street without a known legal guardian.

223.    Ms. Martinez, as she was pulled away from her children, yelled for her visiting mother to come out of the family's home. The ICE officials ignored Ms. Perez, refused to tell the children's father their location, and showed little concern for M.A.M. and U.A.M.'s safety and well-being as they took Ms. Martinez away.

224.    As a direct result, U.A.M. and M.A.M. suffered foreseeable mental and emotional harm—difficulty sleeping, frequent nightmares, anxiety, and depression which are symptoms of emotional distress that are severe enough to result in illness or bodily harm.

225.    The officers' conduct constitutes negligence under Connecticut law.

226.    The officers were acting within the scope of their employment, as federal agents conducting an arrest, when they acted negligently towards Ms. Martinez, M.A.M., and U.A.M.

227.    Under the FTCA, the United States is liable to Plaintiffs for damages for negligent infliction of emotional distress.

## EIGHTH CLAIM FOR RELIEF

## FTCA, 28 U.S.C. §§ 2671–2680

## LOSS OF CONSORTIUM

## (Plaintiffs M.A.M. and U.A.M.)

228.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this complaint as if fully set forth herein.

229.    Under Connecticut law, a plaintiff must prove that their loss of consortium claim is (1) joined with, and derivative of, a parent's claim, and (2) raised by a person who was a minor on the date that the parent was injured. *Campos v. Coleman*, 123 A.3d 854, 868 (Conn. 2015).

230.    M.A.M. and U.A.M. bring this loss of consortium claim together with Ms. Martinez's claims of intentional infliction of emotional distress, negligent infliction of emotional distress, false arrest, false imprisonment, abuse of process, assault, recklessness, and negligence.

231.    M.A.M. was thirteen years old, and U.A.M. was eight years old at the time of their mother's arrest. M.A.M. will not turn eighteen until 2030; U.A.M. will not turn eighteen until 2035.

232.    "The parent-child relationship is unique in its emotional closeness, in its value to society and in its generation of enforceable legal rights and obligations." *Campos*, 123 A.3d at 861.

233.    Ms. Martinez played a special role in her children's lives: packing U.A.M. his favorite foods for lunch, driving U.A.M. and M.A.M. to school, and attending parent teacher conferences for both M.A.M. and U.A.M.

31

234.    Ms. Martinez was a fierce advocate for her children, particularly for U.A.M. whose speech, language, and developmental disabilities make it difficult for him to communicate and care for himself in an age-appropriate manner.  Ms. Martinez ensured U.A.M. received counseling and necessary school accommodations.

235.    Both M.A.M. and U.A.M. were very close with and dependent on their mother, and they have been harmed by both witnessing their mother's abduction and experiencing her painful absence. U.A.M. has developed a fear of all uniformed authority figures and perceives them as a threat to the safety of his loved ones, and M.A.M. has been forced to assume a caretaking role.

236.    Recovery for loss of consortium is not limited to those children whose parents have suffered a "serious, permanent and disabling mental or physical injury." *Id*. at 869. When determining damages available for children claiming loss of consortium, the effect on the parent-child relationship, and the child's emotional and physical characteristics are considered as well.

237.    The effect of the ICE officers' tortious actions on M.A.M. and U.A.M. constitutes a loss of parental consortium under Connecticut common law.

238.    Under the FTCA, the United States is liable to M.A.M. and U.A.M. for damages for their loss of parental consortium.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment against Defendant and award the following relief:

   a.  Award Plaintiffs compensatory damages in an amount to be determined at trial;

   b.  Award Plaintiffs attorneys' fees; and

   c.  Grant such additional and further relief as the Court deems just and proper.

Date: June 15, 2026

/s/ Michael Wishnie

Brenda Cachay Gutiérrez, Law Student Intern[*]
Elijah DeVaughn, Law Student Intern[*]
Karley Nadolski, Law Student Intern[*]
Chukwuemeka Osuagwu, Law Student Intern[*]
Madelyn Finucane, Supervising Attorney (ct31861)
Michael Wishnie, Supervising Attorney (ct27221)
Worker and Immigrant Rights Advocacy Clinic
Jerome N. Frank Legal Services Organization
Yale Law School[**]
127 Wall Street
New Haven, CT 06511
michael.wishnie@ylsclinics.org

[*] Motion for law student appearance forthcoming.
[**] This complaint does not purport to state the views of Yale Law School, if any.